U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED LAFAYETTE

OCT 31 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

Slade — Civil Action No. 6:11-cv-2164

versus — Judge Richard T. Haik, Sr.

Progressive Security Insurance Co. — Magistrate Judge C. Michael Hill

## MEMORANDUM RULING

Before the Court is Motion For Class Certification, filed by plaintiff, Cheryl Slade, individually and on behalf of others similarly situated, [Rec. Doc. 103], a Memorandum in Opposition to plaintiffs' motion filed by Progressive Security Insurance Company ("Progressive") [Rec. Doc. 108] and plaintiffs' Reply thereto [Rec. Doc. 115]. In addition, on September 16, 2014, the Court conducted an evidentiary hearing during which the Court heard live and video testimony and has received and reviewed additional documents and deposition testimony in connection with the hearing. Based on the foregoing, the Court makes the following findings of fact and conclusions of law[1] in finding that plaintiff has met her burden under Federal Rule of Civil Procedure 23 to satisfy the prerequisites for class certification.

*Findings of Fact*

On November 10, 2011, plaintiff, Cheryl Slade, ("Slade") filed this action in the Fifteenth Judicial District Court, Lafayette Parish, Louisiana. *R. 1-2, Complaint &*

---

[1] To the extent any of the following findings of fact comprise conclusions of law or a mixed finding of fact and law, they shall be considered as such.

*Amended Complaint.* Progressive removed the action to this Court on December 16, 2011. Plaintiff, an insured of Progressive in the State of Louisiana, alleges that Progressive paid her, and others similarly situated, less for their total loss vehicles than the amount to which they were entitled under their insurance policies. Plaintiff seeks to recover damages for breach of insurance contract, statutory penalties and attorney's fees under La. R.S. 22:1973(A) and (B)(5) and fraud.[2] Plaintiff also prays that this matter be certified and maintained as a class action:[3]

> All named Louisiana Progressive insureds who received payment for total loss motor vehicles located in the State of Louisiana, under the terms of their collision automobile insurance policy with Progressive Security Insurance, utilizing the Mitchell Work Center Total Loss (WCTL) system, from July 1, 2010 to the date of notice of class certification.

In July 2010, Progressive began using a proprietary product called Work Center Total Loss ("WCTL") licensed from Mitchell International, Inc. ("Mitchell")[4], to determine the actual cash values of total loss vehicles in the State of Louisiana. Prior to July 2010, Progressive determined the actual cash value of total loss vehicles in Louisiana by using the National Automobile Dealers Association ("NADA") Guidebook.[5]

---

[2] *See* Partial Judgment dated March 5, 2013. *R. 46.*

[3] Plaintiff proposes two class representatives in addition to herself—Carnelius Borel-Minix and Denis Wayne Stevens, both of whom were insured by Progressive and had total loss vehicles.

[4] John Retton, Progressive's representative, testified that J.D. Power owns the WCTL methodology which Mitchell uses. *R. 123, p. 135:2-6.*

[5] In addition to NADA Guidebook, Kelley Blue Book ("KBB") is also available to buyers and sellers of used cars to provide values for the sale of used cars. *R. 108, Cook Depo., Ex. 4.*

Since July 2010, Progressive has used WCTL to determine first party total loss values for approximately 15,000 claims in Louisiana. *R. 123, pp. 177:1-178:6.*

WCTL provides total loss valuations automatically based on comparable vehicle data contained in its computer system and objective loss vehicle data provided to it by Progressive inspectors, called Manage Repair Representatives ("MRR"), through a computer interface. Included among the data provided by the MRR to the WCTL system are the Vehicle Identification Number (VIN)—which includes the vehicle make, model, configuration (e.g. extras) and year— as well as the mileage and license plate number. *R. 123, pp. 130:20-132:15.* The MRR also assigns a numerical value between 1 and 5 to reflect the overall vehicle condition as to each of thirteen characteristics listed in the Valuation Report, including Interior, Exterior, Mechanical and Tire. *Id., pp. 84:15-85:15; pp. 142:21-143:4; R. 103, Ex. F; R. 110-4, Nayak Declaration.*

Although the Progressive records contain verbal descriptions of the vehicle conditions which the MRR considers and uses in the assignment of the overall condition value, the WCTL computer system does not take this information into account, relying on only the numerical condition characteristics to reach its value determination. *Id., p. 144:6-18; Nayak Depo., p. 104:1-24.*

WCTL uses weighted averages of the condition values to arrive at an overall condition score between 1 and 5. The score is provided to Progressive within seconds of

receiving the loss vehicle information input from the MRR. *R. 123, p. 148:15; R. 110-4, Nayak Declaration.*

Relying on the loss valuation numerical value only, the WCTL system locates vehicles comparable to the loss vehicle by searching a collection of vehicles being offered for sale by a dealer located as close to the loss vehicle's Zip Code as possible. The WCTL's collection of comparable vehicles is updated at least monthly. *Id., pp. 140:15-22;145:22-25*; *147:4-13*.

The MRR does not have discretion to deviate from the WCTL numerical value. *Creech Depo., p. 21:3-11; Bunney Depo., p. 62:4-10, Prejean Depo. pp. 33:17-34:2, 53:3-54:18.*

The WCTL methodology is different from the methodology used by NADA or KBB. *R. 123, Hassell, pp. 219:23-25*.

NADA and KBB provide values based on all sales within a given region, i.e. Southwestern Edition for Arkansas, Louisiana, Oklahoma and Texas. WCTL bases its value on selected comparable vehicles within a set distance from the loss vehicle: three for cars, five for trucks. *Id., pp. 168:1-6; 201:23-203:7.*

NADA and KBB publish a single retail number, i.e. "retail clean." *Id., p. 109:3-17*. The is the same as in the Mitchell condition guide—as a vehicle gets older, the more damage it has. *Id., pp. 169:8-171:1.*

A Progressive claims adjuster can determine the NADA value of the loss vehicle by pressing an "NADA button" on his or her computer. *R. 126-2, Bunney Depo., pp. 60:15-25*; *R. 126-3, Prejean Depo., pp. 52:14-24, 54:19-25; 58:21-59:11.*

WCTL bases its value on an existing pool of comparable vehicles within a set distance from the loss vehicle: three for cars, five for trucks. WCTL then "adjusts" the comparable vehicles to match the loss vehicle, by adding or subtracting value for differences in vehicle equipment or mileage. *R. 123, Hassell, pp. 151:9-152:23*. The comparable values are then averaged to arrive at a "base price" which is further adjusted for the condition of the loss vehicle. The overall condition factor is used to determine a percentage reduction or increase of the base price. If the condition factor is less than 3.0, the base price is adjusted downward by a certain percentage based on the difference between the overall condition factor and 3.0. If the condition factor is greater than 3.0, then the base value is adjusted upwards. *R. 123, Retton, pp. 154:8-155:16.*

WCTL adjusts base values downward for condition more than four times more often than it adjusts them upwards for condition. *Id., p. 200:6-15*; *R. 103, Ex. C, at MITCHELL000804*; *Ex. H.*

Comparable vehicles used by WCTL may be in a wide variety of conditions. *R. 123, Retton, pp. 216:20-218:18.* The WCTL system has no information as to the condition of the comparable vehicles and does not take such information into consideration in determining the base price. *Id., pp. 203:22-25;204:*1.

Progressive represents that a condition rating of 3.0 is "typical" throughout its implementation of WCTL. The 3.0 rating is "typical" for vehicles offered for retail sale on dealers' lots, not cars on the street, for which the typical rating is 2.82. This difference is due to the fact that dealers prepare used cars for retail sale to make them "ready for sale." *Id., pp. 187:1-192:3; 199:12-19.*

If a loss vehicle's rating is 2.82, WCTL reduces the base price by a factor to show the difference between 2.82 and 3.0. *Id., p. 193:8-12.*

Every Progressive insured whose total loss is determined by the WCTL system in Louisiana receives a Mitchell Work Center Total Loss Report, setting forth the WCTL valuation. *Id., pp. 132:22-133:3.*

A marketing presentation by Mitchell to prospective insurance company clients stated that the average market value as determined by WCTL was $6780, as compared to an average value of $7,680 under NADA. *R. 103, Ex. C, at MITCHELL 000804.* A presentation by Mitchell to Progressive, analyzing Progressive total loss claims adjusted under the WCTL system found that the average condition rating of 2.83 resulted in an average adjustment of -$245.46 per total loss claim. *Id., Ex. G, MITCHELL000826.*

Progressive's own tracking of its total loss claims adjusted under WCTL shows that from May 2012 to April 2014, an average of 78% of total loss vehicles received a downward condition adjustment as compared to only 18% that received an upward adjustment. The average condition adjustment for that period was -$301. *R. 103, Ex. H.*

On February 12, 2011, plaintiff was involved in a collision and made a claim under her Progressive Auto Policy ("the Policy"). Progressive determined that her Volvo was a total loss. *R. 1.*

Under the Policy, Progressive promised to pay the "actual cash value" of a covered vehicle at the time it was damaged, if that amount is the lowest of four amounts set forth in the Policy. *R.108-14, Policy, Part IV - Damage To A Vehicle, Limits of Liability, p. 19, § 1(a-d).* The Policy states that Progressive would determine the "actual cash value" of the vehicle based on the "market value, age, and condition of the vehicle at the time the loss occurs." *Id., p. 20, § 2(g).* The Policy also states that in determining the amount it would pay in the event of a loss, Progressive could "use estimating, appraisal, or injury evaluation systems," including "computer software, databases, and specialized technology." developed either by Progressive or a third party. *Id., Part VII-General Provisions, Settlement of Claims, p. 26.* Finally, the Policy includes a provision that permits (but does not require) either Plaintiff or Progressive to initiate a voluntary appraisal process to resolve any disputes regarding the value of the loss vehicle. *Id., Part IV, Appraisal, p. 22.*

Progressive used WCTL to assist in calculating the actual cash value of plaintiff's vehicle. After a Progressive adjuster inspected the vehicle and determined it was a total loss, Progressive provided her with a standard WCTL report. The WCTL report provided a condition rating of "2.50 – good." *R. 103, Ex. F.*

Based on the input information, WCTL identified the "list" prices of three used vehicles of the same make and model within a 200-mile radius. *R.123, Retton, p.141:3-21.* WCTL made a downward price adjustment on all three vehicles to account for their lower mileage compared to plaintiff's vehicle and to account for the value of certain equipment on one comparable vehicle that was not included in plaintiff's vehicle. *Id., 151:9-153:2*; *R. 103, Ex. F.* WCTL also made a "projected sold adjustment" on all three vehicles' list prices to reflect the likely amounts for which they would sell according to J.D. Power. *R. 123, Retton, 151:9-153:19.*

WCTL averaged the values of the comparable vehicles to determine the "base value" of plaintiff's vehicle. Based on the three comparables, adjusted for mileage, equipment and projected sold, WCTL arrived at a base price of $6,348.08. The base price of $6,348.09 was then reduced by another $1,168.78 for the "condition adjustment" based on wholesale auction data from Manheim. WCTL makes this "condition adjustment" even though it has no knowledge of the "condition" of the comparable vehicles. *Id., pp. 151:9-157:12.*

The WCTL value placed on plaintiff's vehicle was $5,215.30. *R. 103, Ex. F*; *R. 108, Ex. 17.*

Plaintiff was advised by her mechanic that her vehicle was worth much more than Progressive's WCTL valuation. *R. 123, Slade, pp. 12:3-10.* She provided Progressive with an NADA retail valuation of $8,875.00 that she obtained from NADA's consumer

website on February 11, 2011. *Id., pp.16:3-17:3;R. 103, Ex. J.* Plaintiff also obtained a KBB retail value of $8,710.00. *R. 103, Ex. K.*

While plaintiff provided Progressive with the NADA information, Progressive refused to pay her more than the WCTL valuation. *R. 123, Slade, pp. 16:14-18:20.* Plaintiff was not advised that Progressive had previously obtained its own NADA valuation for her vehicle of $8,725.00.[6] *Id., pp. 19:1-10; R. 103, Ex. S.*

In the evidentiary hearing, plaintiff called two potential class members as witnesses, Denis Wayne Stevens and Carnelius Borel-Minix. *R. 123, Stevens, p. 53, p. 33.*

Stevens testified that his 2006 Ford F250 Super Duty V-8 Crew Cab XLT 2wd Diesel truck, insured by Progressive, was stolen on or about May 25, 2012. At the time of the theft, Stevens' truck had approximately 130,000 miles on it. *R. 103, Ex. L.*

Progressive valued the total loss using WCTL. Since the truck had been stolen, it was assigned a default condition of 3.0 "typical." Using five comparables adjusted for mileage and equipment, the WCTL system determined a total loss value of $12,972.51. *Id.*

Stevens testified that he does not disagree with Progressive's condition determination of his truck. *R. 123, Stevens, p. 58:21-25.*

Stevens' testified that his banker advised him the truck was worth was worth $19,000 to $20,000. *Id., p. 59:7-12.*

---

[6] The difference between the NADA value of $8,725.00 that Progressive obtained and the value of $8,875.00 that plaintiff obtained is that the free consumer website provides national values, while the NADA value obtained by Progressive is regional.

Stevens also testified that after searching the surrounding area, he could not find a comparable truck for Progressive's total loss value, and could only purchase a 1999 (7 years older), gasoline, two-door, short bed truck with the amount Progressive paid him. *Id., pp. 57:24-58:10; 60:9-17.*

The NADA retail value for the Southwest Region for Stevens' truck as of the date of loss was $19,450.00. *R. 103, Ex. V.*

Borel-Minix, as an insured of Progressive, testified that she had two vehicle total loss claims adjusted under the WCTL system, a 2001 Chevrolet Impala and a 2000 Ford Taurus. *R. 123, Borel-Minix, p. 35:7-9.*

On or about April 9, 2012, the 2001 Chevrolet Impala was involved in an accident and Progressive declared the vehicle a total loss. Using three comparables adjusted for mileage and equipment, the WCTL system determined a base value of $3,774.77. *R. 103, Ex. M.* The Progressive adjuster gave the vehicle an overall condition score of "2.74 – good." Borel-Minix does not contest this condition value and believes the condition description in the WCTL Report to be accurate. *R. 123, Borel-Minix, pp. 37:13-38:1.* WCTL adjusted the base value downward by $317.53. *R. 103, Ex. M.*

Borel-Minix was not advised that Progressive had obtained a NADA retail valuation of $3,745.00 for the Chevrolet Impala. *R. 103, Ex.* S, at PROGRESSIVE00019095; *R. 123,Borel-Minix, p. 40:18-23.*

Borel-Minix also had a total loss claim involving a 2000 Ford Taurus in May of 2013. Based on five comparables adjusted for mileage, equipment and projected sold, the WCTL determined a base value of $3,564.90. *R. 103, Ex. N.* Based on the Progressive adjuster's overall evaluation of the condition of the vehicle as "2.38 – fair," this base value was then reduced by a $616.51 "conditioning adjustment." Borel-Minix does not contest the 2.38 fair condition assessment and believes the condition description in the WCTL Report to be accurate. *R. 123, Borel-Minix, pp. 39:20-40:4.*

Plaintiff as well as Stevens and Borel-Minix testified that they have a general understanding of the lawsuit, understand that it is a class action, are aware of their duties as class representatives, and will adequately fulfill those duties. *R. 123, Slade, pp. 19:13-21:14; Stevens, pp. 60:19-62:11; pp. 41:2-42:10.*

Plaintiff does not challenge the numerical condition determination by Progressive's adjusters. *R. 123, Slade, pp. 13:14-14:8.*

Progressive's computerized records contain the name and address of every individual in the state of Louisiana for whom Progressive has paid a total vehicle loss claim based on a valuation conducted under WCTL. *R. 103, Hartel Depo., p. 21:20-24.* Progressive also has the date of loss, vehicle make, model, year, equipment, mileage, condition rating, comparable vehicle data used, base price and market price as established by WCTL for each claim. *Id., pp. 22:11-23:25.*

The Court accepted Dr. Johnette Hassell as an expert in computer science, computer forensics, e-discovery, and data management. *R. 123, Hassell, p. 73:18-23.* Dr. Hassell testified that, using Progressive's data, the difference between the WCTL value and the NADA retail value or KBB retail value could be determined for every class member and provided to the Court in spreadsheet form. *Id., pp. 83:8-84:10.*

With the exception of stolen or burned vehicles, the historical NADA retail value as of the date of loss for most of the potential class members is contained in Progressive's own computer records. *R. 103, Hartel Depo., pp. 21:20-24-22:17.* The data contained in Progressive's records can be used to obtain historical values from NADA for those who Progressive does not already have the NADA value. *R. 123, Hassell, p. 80:12-15*; *pp. 94:7-95:4.*

Progressive's representative, John Retton, testified that claimants have the opportunity to negotiate their payments after receipt of the WCTL evaluation. Plaintiff's 12-month analysis of Progressive's records indicates that only 0.9%, or approximately 150, of the potential class members received a settlement adjustment. *R. 103, Retton Depo., Ex. H.*

The Court finds that there is evidence of a common course of conduct affecting all class members, from which a finder of fact could make a common finding of liability to the entire class, as well as determine a common, formulaic method for measuring individual damages.

The Court further finds that plaintiff's counsel are experienced in litigating class actions of this size, and are familiar with the tools used to adjudicate individual issues in class actions, both in instances where claims data needs to be obtained from over ten thousand individuals and where damages can be determined by reference to computer data in defendants' possession. *R. 123, Testimony of Murray.*

*Conclusions of Law*

Class Certification is governed by Federal Rule of Civil Procedure 23. To warrant class certification, all of Rule 23(a)'s threshold requirements must be satisfied as well as one of the conditions contained in Rule 23(b). *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir.2012). Rule 23(a) requires that:

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed.R.Civ.P. 23(a).

Plaintiff, as the party seeking class certification, bears the burden of establishing that Rule 23's requirements have been met. *Wal–Mart v. Dukes*, 131 S.Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."); *MD*, 675 F.3d at 837.

In determining whether Rule 23 has been satisfied, courts are instructed to conduct a "rigorous analysis" and to "look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.' " *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir.2003). This rigorous analysis will sometimes touch upon the merits of a plaintiff's case as "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal–Mart*, 131 S.Ct. at 2551.

However, any inquiry into the merits of a plaintiff's case at this stage is limited to those issues germane to class certification. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013).

***Numerosity***

Rule 23(a)(1) "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 329 (1980). There is no magic number: "The proper focus is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir.1981). Courts

must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir.1981).

***Commonality***

Rule 23(a)(2) allows a class action to be maintained if "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members. Several such issues exist in this case, including whether the Secretary violated § 504 or the ADA by failing to direct local election officials to enforce these statutes. Furthermore, allegations of similar discriminatory practices generally meet the commonality requirement." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir.1997).

***Typicality***

Typicality is a requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "The test for typicality, like the test for commonality, is not demanding [and] focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent." *Lightbourn v. City of El Paso,* 118 F.3d 421, 426 (5th Cir.1997). "The critical inquiry is whether the class representative's claims have the same essential characteristics of the putative class. If the claims arise from a

similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir.2001). It is Plaintiffs' burden to show the claims or defenses applicable to the class representatives are typical of the class representatives. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479, n. 4 (5th Cir. 2001).

***Adequacy***

Like typicality, adequacy or representation also tends to merge with commonality, though it "also raises concerns about the competency of class counsel and conflicts of interest." *Wal–Mart*, 131 S.Ct. at 2551 n. 5. Adequacy of representation " 'encompasses class representatives, their counsel, and the relationship between the two.' " *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir.2002). In evaluating this requirement, a court "must consider '[1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]' " *Id.*

Considering the foregoing law, based on the entire record before it, the Court finds that the requirements of Rule 23(a) are met in this case.

Plaintiff also seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir.2011).

***Predominance***

"This requirement, although reminiscent of the commonality requirement of Rule 23(a), is more demanding than the commonality prong of Rule 23(a) "because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir.2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). This remains true after *Dukes*. *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").

***Superiority***

Rule 23(b)(3) also requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In evaluating superiority, the Court must consider the likely difficulties in managing the case, specifically "the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 164 (1972).

Rule 12(b)(3) also lists four factors to be considered in determining whether class action procedure is superior: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed. Rule Civ. P. 23(b)(3).

The Court finds that common issues predominate over individual issues, and class action treatment is the superior method of resolving these claims such that certification under FRCP 23(b)(3) is appropriate. Once the common questions of fact have been resolved, any remaining issues can be resolved by reference to Progressive's own computer data. If it is shown that NADA is a generally recognized used motor vehicle industry source, and WCTL is not, then the determination of each individual class member's entitlement will be a matter of comparing the NADA value (either already contained in Progressive's data or derived from Progressive's data) to the WCTL valuation and finding the difference. If it is shown that Progressive misused its condition evaluations, then adjustments can be made to the valuations in accordance with those findings. The dispute is how a computerized system applied objective claims data—not the data that was entered into the system. Resolution can be achieved by revising the computerized system to apply the data properly.

Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim. *See Roper v. Consurve, Inc.*,

578 F.2d 1106, 1112 (5th Cir.1978). Once common questions have been answered in this case, individual issues will be resolved by automated processing of computer data, the same method by which Progressive used WCTL to determine values in the first place.

The Court also finds that the misrepresentation claims, which turn on uniform misrepresentations and omissions to all class members, meet the requirement of predominance. *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307 (5th Cir. 1977).

As it is conceded that the plaintiff and proposed putative plaintiffs have no quarrel with the conditioning determinations of Progressive's adjusters, the Court will not be required to review the individual subjective condition evaluations of Progressive's adjusters. Rather, the dispute is with the manner in which the automated WCTL system used those condition determinations in reaching its valuations.

The Court finds that the hurricane property damage adjusting cases cited by Progressive for the proposition that predominance cannot be satisfied in cases involving insurance adjusting practices are distinguishable from this action. *See e.g. Henry v. Allstate Ins. Co.*, 2007 WL 2287817 (E.D. La. Aug. 8, 2007); *Spiers v. Lib. Mut. Fire Ins. Co.*, 2006 WL 4764430 (E.D. La. Nov. 21, 2006). Here, unlike the storm damage cases, the claim is that Progressive used an unacceptable computer system. Determination of undervaluation is a matter of re-running existing data through a different computer system.

The Court finds that class action treatment is superior to other means of adjudication in this case. According to Progressive's records, the average difference

between NADA and WCTL is less than one thousand dollars, not enough to justify the cost of litigation. The existence of a negative value claim is the "most compelling rationale for finding superiority." *Castano v. American Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996). Additionally, as much of the proof offered in support of the claims is only within Progressive and/or Mitchell's sole possession, and also subject to a confidentiality order[7], most of the class members are unaware of the facts that give rise to these claims.

Accordingly, the Court will certify this matter as a class action pursuant to FRCP 23(b)(3).

Richard T. Haik, Sr.

[7] The Court entered the parties agreed Confidentiality Protective Order on August 2, 2013. *R. 60.*