IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

**CHERYL SLADE, Individually and on behalf of others similarly situated**

**CASE NO.:  6:11-cv-02164**

**VERSUS**

**PROGRESSIVE SECURITY INSURANCE**

**JUDGE MICHAEL J. JUNEAU**

**MAG. JUDGE CAROL B. WHITEHURST**

## MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## **TABLE OF CONTENTS**

Table of Authorities...................................................................... iii

Statement of Facts......................................................................... 1

Procedural History........................................................................ 5

Argument................................................................................ 10

      I.  Standard to be applied to Rule 23(e) fairness inquiry ........................... 10

      II.  Presumptions in favor of a finding of fairness................................. 11

      III.  Analysis under the *Reed* factors ........................................... 12

            1.  Lack of fraud and collusion behind the settlement ..................... 13

            2.  Complexity, expense, and likely duration of the litigation .............. 14

            3.  Stage of the proceedings and the amount of discovery completed ......... 14

            4.  Probability of plaintiffs' success on the merits ....................... 15

            5.  Range of Possible Recovery ......................................... 18

            6.  Opinions of the class counsel, class representatives, and
                absent class members....................................... 21

Conclusion.............................................................................. 24

Certificate of Service ................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

*Calogero v. Safeway Ins. Co.*, 1999-1625 (La. 1/19/00), 753 So. 2d 170, 174.. . . . . . . . . . . . . 19

*Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 18

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007). . . . . . . . . . . . . . . . . . . 11, 12

*Evans v. Jeff D.*, 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). . . . . . . . . . . . 10

*Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.),
    *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).. . . . . . . . . . . . . . . . . 11

*In re Chinese Drywall Products Liability Litigation*, 424 F.Supp. 3d 456,
    486 (E.D. La. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 216 (1981) . . . . . . . . . . 17, 19, 20

*In re Linkedin User Privacy Litigation*, 309 F.R.D. 573, 586 (N.D. Cal. 2015). . . . . . . . . . . . . 17

*In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D 112, at 148 (E.D. La. 2013)... . . . . . . . 14

*In re Shell Oil Refinery*, 155 F.R.D. 552, 559 (E.D.La.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Parker v. Anderson*, 667 F.2d 1204, 1208-1209 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983). . . . . . . . . . . . . . . . . . . . . 12, 20

*Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107 (La. 10/21/03),
    857 So.2d 1012, 1021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Slade v. Progressive*, 856 F.3d 408, 411 (5th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Young v. Katz*, 447 F.2d 431 (5th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## <u>Other Authorities</u>

La. R.S. 22:1973. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

La. R.S. 22:1892A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

La.R.S. 22:1892B(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 5, 7, 8, 16, 17

FRCP Rule 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

FRCP Rule 23(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13

FRCP Rule 23(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15, 17

Class Action Fairness Act (CAFA). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

NEWBERG ON CLASS ACTIONS § 11:41 (4th ed.2002). . . . . . . . . . . . . . . . . . . . . . . . . 13

MAY IT PLEASE THE COURT:

Plaintiffs seek final approval of the Settlement Agreement attached as Exhibit A. The Settlement Agreement, which creates a non-reversionary[1] settlement fund of $40,000,000, the entirety of which will be disbursed equitably to class members by a special master without a claims process, is fair, reasonable and adequate.

## STATEMENT OF FACTS

Nearly a decade ago, Cheryl Slade filed suit individually and on behalf of all other Louisiana insureds of defendant Progressive Security Insurance Company (Progressive) whose first party vehicle total loss claims were adjusted using the Mitchell Work Center Total Loss (WCTL) valuation system.  The suit alleged that the use of the WCTL did not conform to any of the exclusive methods of valuing first party vehicle total loss claims allowed by La. R.S. 22:1892B(5).  Specifically, Plaintiffs lawsuit asserted that the statute allows use a database system such as WCTL only if that system is a "generally recognized used motor vehicle industry source" and that WCTL, which is available only to Mitchell's insurance company subscribers, is not such a source.

As damages, Plaintiffs sought the difference between the value obtained under WCTL and the value provided by the National Automobile Dealer's Association (NADA) guide, a genuine used motor vehicle industry source.  In Ms. Slade's case, the difference between the NADA value, adjusted for condition, and the WCTL value assigned to her vehicle was $2,490.92.  Additionally and alternatively, Slade contended that, even if the WCTL system were found to be a generally

---

[1]  The only aspect of the agreement that could be considered "reversionary" is the provision that any uncashed settlement check amounts will revert to Progressive one year after distribution.

-1-

recognized used motor vehicle industry source, La. R.S. 22:1892B(5) did not allow for reductions of the WCTL value on the basis of condition.

Plaintiffs also sought statutory penalties and attorneys' fees pursuant to La. R.S. 22:1892 and La. R.S. 22:1973, on the grounds that Progressive's decision to use WCTL was in bad faith. To prevail on this claim, Plaintiffs would have to show not only that Progressive violated La. R.S. 22:1892B(5), but also that the decision to use the WCTL system was a violation of the duty of good faith and fair dealing.

Ms. Slade was joined in the litigation by fellow Court-appointed class representatives D. Wayne Stevens and Carnelius Borel-Minix. The difference between NADA and WCTL for Mr. Stevens' vehicle was $6,477.49.[2] Like a significant percentage of the class, Borel-Minix's WCTL valuation was *higher* than NADA, so she would not have suffered damages under Plaintiffs' proposed damage model. However, Borel-Minix claimed she was entitled to penalties if the use of the system was found to violate La. R.S 22:1892B(5), regardless of whether she could demonstrate any loss. Progressive has contested this contention throughout the litigation, asserting that only class members who were proven to suffer damages could recover penalties. Additionally and alternatively, Borel-Minix asserted that she had been harmed by the use of a negative condition adjustment, which Plaintiffs contend violates La. R.S. 22:1892B(5). Progressive not only opposed this contention, but further asserted that Plaintiffs waived any arising from condition when arguing before the Fifth Circuit.

---

[2] Progressive adjusters found that no condition adjustment was necessary, so the NADA value need not be adjusted for condition as it was in Ms. Slade's case.

Plaintiffs obtained WCTL valuation reports for all class members' total loss claims. Progressive ultimately conceded that approximately 42,000 claims met the class definition. Plaintiffs also obtained "rough" NADA valuations from Progressive's records. Progressive asserted that these "rough" NADA values varied from actual NADA values for the vehicles at issue. Comparing these "rough" NADA values (adjusted for condition) to WCTL market values, Plaintiffs found that the total amount of the difference between NADA and WCTL in cases where NADA exceeded WCTL was $20,757,193.82.[3]

Because Progressive asserted that its "rough" NADA values were not accurate, Plaintiffs obtained a statistically valid sample of 1,800 actual NADA values  and compared those to WCTL values. Tulane Professor of statistics Dr. Michelle Lacey used this sample to project the class-wide incidence of claims where NADA base value exceeded WCTL base value, as well as the projected amount of the difference in those claims. Dr. Lacey projected that, across the class, the difference between WCTL and NADA base values in cases where NADA exceeded WCTL would be $35 million.[4] Progressive vehemently contested this damages calculation, and moved to decertify the class because the statistical projection could not identify which class members had NADA valuations lower than WCTL. Progressive challenged not only the use of a statistical projection, but also use of the difference between WCTL and NADA as the measure of damages. At trial, Progressive planned to call several experts to challenge the damage calculation, asserting that Plaintiffs could

---

[3]  See Report of Dr. Johnette Hassell, attached hereto as Exhibit B, at ¶60

[4]   See Expert Report of Dr. Michelle Lacey, attached hereto as Exhibit C at ¶17.  *NB*: Dr. Lacey's statistical projection could only narrow damages to a range between $32 million and $39 million. $35 million is the mid-point of this range.  Progressive asserted that Dr. Lacey's inability to narrow the range rendered her projections unreliable, an issue Progressive doubtless would have presented at trial and on appeal.

not meet their burden to prove any harm as a result of its use of WCTL, even if WCTL were found to violate La. R.S. 22:1892B(5).

After several years of arm's length negotiations, which included one in person formal mediation session in 2018, the parties at last agreed to settle the Class's claims for $40,000,000.00. The settlement fund is nearly twice the damages calculated using Progressive's "rough" NADA values and $5 million greater than Dr. Lacey's projected class-wide damages.  One hundred percent of this fund (after attorneys' fees and costs) will be distributed to the class members, without the need of any class member to provide any proof of claim.  Per the terms of the agreement, a Court-appointed special master will allocate the settlement fund equitably among the class members.  Class Counsel and the class representatives consider this settlement to be an excellent result for the class.[5]

This Court has already appointed Randi Ellis to undertake the fund distribution.  Special Master Ellis has advised the Court that under her proposed distribution plan, class members will receive a base award of a fixed amount in recognition of their potential claim for statutory penalties, without regard to actual damages.[6]  Then, Special Master Ellis will make a damage allocation to class members based on the difference between their NADA and WCTL valuations.[7]  For this calculation, Special Master Ellis will obtain actual NADA values from NADA rather than rely on the "rough" NADA values obtained by Progressive. Thus, each class member's allocation will be based on that class member's actual individual damages under the damage model approved by the

---

[5]  See affidavits of Class Counsel, attached hereto as Exhibit D and class representatives, attached hereto as Exhibit E.

[6]  See Affidavit of Randi Ellis, attached hereto as Exhibit F

[7]  *Id.*

-4-

Fifth Circuit.   This Plan was included in the documents made available to class members on the settlement notice website.

## PROCEDURAL HISTORY

The procedural history of this class action is long and complex, spanning nearly a decade. The following recitation will focus only on the most significant motion practice, appeals and rulings.

Plaintiff Cheryl Slade originally filed this action on November 11, 2011 in the 15th Judicial District Court for the Parish of Lafayette, State of Louisiana.  Progressive promptly removed the action to this Honorable Court under the Class Action Fairness Act (CAFA).  Plaintiff did not oppose the removal.

Shortly after removal to this Court, Progressive moved to dismiss for failure to state a claim pursuant to FRCP Rule 12(b)(6), asserting that its insurance contract specifically allowed for use third party systems such as WCTL.  Plaintiff countered that the insuring agreement had to be reformed to comply with La. R.S. 22:1892B(5).  This Court accepted Plaintiff's argument and denied the Progressive's motion to dismiss.

The parties negotiated a scheduling order to take them through Class Certification.  Nearly a score of depositions were taken prior to class certification alone.  Plaintiffs responded to voluminous discovery requests from Progressive.  Progressive likewise responded to voluminous written discovery from Plaintiffs, producing tens of thousands of pages of documents, all of which were painstakingly reviewed by class counsel.  Additionally, Plaintiffs propounded discovery to Mitchell, who produced tens of thousands more pages of documents.  The parties had both formal and informal discovery disputes, some of which were the subject of motions to compel production.

After exhaustive briefing, on September 16, 2014, a class certification hearing was held before Judge Richard Haik.  The hearing lasted a full day, during which several witnesses testified live and more than a dozen other witnesses testified by deposition.  Following the class certification hearing, the parties submitted substantial proposed findings of fact and conclusions of law.  Upon consideration of the considerable record presented, Judge Haik certified the class action by Order dated October 31, 2014.

Progressive timely petitioned the United States Fifth Circuit Court of Appeal for permission to appeal class certification pursuant to FRCP Rule 23(f).  Class Counsel submitted a lengthy response to the appeal petition.  Two out of three Fifth Circuit judges considering the petition voted to grant it, and Progressive was allowed to appeal.  The parties then fully briefed the appeal, each side being granted twice the usual page limits in light of the complicated issues presented.  On May 9, 2017, the Fifth Circuit rendered judgment.

The Fifth Circuit found that Plaintiffs' proposed damage model of applying the WCTL condition adjustments to NADA values, then comparing the condition-adjusted NADA values to the WCTL valuations was "sound."  *Slade v. Progressive*, 856 F.3d 408, 411 (5th Cir. 2017).  However, the appellate court remanded the class certification question for further consideration of adequacy of representation.  Additionally, the Court reversed Judge Haik's certification of the fraud claims.

On remand, the parties exhaustively briefed the adequacy of representation issue.  By Report and Recommendation dated October 2, 2017, Magistrate Judge Whitehurst found that the class should remain certified.  Progressive objected to Magistrate Judge Whitehurst's Report and Recommendation, sparking yet another round of briefing.  By Order dated September 16, 2018, Judge D. Dee Drell, sitting by designation, adopted Magistrate Judge Whitehurst's Report and

Recommendation. This ruling prompted a second 23(f) petition, which Plaintiffs opposed. By Order dated October 16, 2018, a unanimous panel of the Fifth Circuit denied Progressive's Petition for 23(f) appeal of the second class certification ruling.

With class certification at last resolved, the parties negotiated a notice plan which they submitted to the Court. The Court approved the notice plan, and in June of 2019, notice was published to the class, both by direct mail and publication. Only 19 class members opted out of the certified litigation class.

Plaintiffs then submitted post-certification discovery to Progressive, including requests for production of all WCTL reports and NADA valuations for all class members in Progressive's possession. Progressive objected to these requests and Plaintiffs moved to compel production. This Court ordered Progressive to produce the absent class-member data. Progressive produced over 50,000 records in pdf form, which had to be painstakingly reviewed and input into a spreadsheet so that data from those records could be analyzed to assess class-member damages.

The parties then negotiated a post-certification scheduling Order. This Scheduling Order provided for non-redundant merits discovery, exchange of reports of experts who would be called to testify at trial, dispositive motion practice, *Daubert* motions, pre-trial hearing, exchange of exhibits to be used at trial, and finally trial in March of this year. The parties then engaged in another round of fact and expert discovery, including numerous depositions and voluminous document productions. Once again, Class Counsel had to compel responses to their discovery.

After completion of extensive pre-trial discovery, the parties filed dispositive motions. Progressive moved for summary judgment on the grounds that its use of WCTL purportedly constituted a local market value survey allowable under La. R.S. 22:1892B(5)(a). Plaintiffs moved

for partial summary judgment on the question of whether La. R.S. 22:1892B(5) permits downward adjustments for condition.  These motions were extensively briefed, with memoranda, Statements of Uncontested Material Fact, and Counter-Statements  numbering in the hundreds of pages.

Additionally, Progressive filed a Motion to Decertify the class, contending that Plaintiffs could not prove common damages by statistical projection and could not rely on Progressive's "rough" NADA values to prove damages.  Plaintiffs filed a detailed opposition.

On October 16, 2020, this Court held a hearing on the parties competing motions for summary judgment.  Ruling from the bench, this Court denied Progressive's Motion for Summary Judgment, finding that WCTL was not a local market value survey as allowed by La. R.S. 22:1892B(5)(a).  This Court then declined to consider Plaintiffs' Partial Motion for Summary Judgment, advising Class Counsel that instead of seeking partial relief, they should file summary judgment as to whether WCTL could be found to satisfy any of the alternative valuations methods allowed under La. R.S. 22:1892B(5).  Plaintiffs filed a Motion for Summary Judgment on Statutory Compliance on October 30, 2020.  Progressive filed a lengthy opposition, and Plaintiffs replied. Hearing on Plaintiffs' Motion for Summary Judgment was set to commence on December 21, 2020.

On October 20, 2020, Magistrate Judge Whitehurst issued her Report & Recommendation on Progressive's Motion to Decertify, recommending that this Court deny the Motion.  Progressive appealed the Report & Recommendation, and Plaintiffs opposed the appeal.  By Order dated November 19, 2020, this Court denied Progressive's appeal of the Report & Recommendation.

Throughout the frenzied briefing on summary judgment and decertification motions, the parties continued to discuss the possibility of settlement.  Prior to the hearing on the summary judgment motion, the parties remained miles apart, with Progressive urging class counsel to accept

a claims-made settlement where only class members who submitted proofs of claim would receive settlement funds.  Class counsel insisted that, since the data necessary to determine individual entitlements was already in Progressive's possession (or could be derived from data in Progressive's possession) there was no need for class members to submit claims.  After the Court denied Progressive's Motion for Summary Judgment, the parties finally began to make significant advances in settlement negotiations

On December 12, 2020, the parties finally agreed in principle to enter into the Settlement Agreement currently under consideration by this Court.  Following more than a month of further arm's length negotiations, the agreement in principle was expanded into the final Settlement Agreement, executed on or about February 3, 2021.  Plaintiffs moved for Preliminary Approval of the Settlement on February 4, 2021.  Plaintiffs also moved that the Court appoint a Special Master and Settlement Administrator as per the terms of the Settlement Agreement.  In the Motion to Appoint Special Master, Plaintiffs submitted the affidavit of proposed Special Master Rani Ellis, in which she identified the method that she intended to use for allocation of the settlement fund.

On March 4, 2021, this Court entered an Order granting preliminary approval of the Settlement Agreement, in which this Court found that the settlement was the result of arm's length negotiation free of collusion and was within the range of possible fairness. (Doc. 337).  The Court instructed Plaintiffs to publish notice of the Settlement to the class, consisting of direct mail and publication in regional newspapers throughout the State.  Notice in accordance with this Court's March 4, 2021 Order was published, and after the delay period set by the Court, only two class-members chose to opt of the class.  No class members exercised their right to object to the settlement.

Accordingly, pursuant to Paragraph 11 of this Court's Order Granting Preliminary Approval, Plaintiffs hereby move this Court for entry of an Order Granting Final Approval of the Settlement Agreement that has been a decade in the making.

## ARGUMENT

The Settlement before the Court, reached after ten years of vigorously contested litigation, is fair, reasonable and adequate.  The $40 million settlement fund is greater than the projected damages under Plaintiffs' proposed damage model (approximately twice the amount of damages when "rough" NADA values obtained from Progressive are used).  One hundred percent of the settlement funds, less court-awarded fees and costs, will be disbursed to absent class members.  A Court-appointed Special Master will ensure that the funds are allocated to class members according to the value of their individual claims under the proposed damage model, while also providing substantial relief to class members who were subjected to the complained-of conduct but who cannot demonstrate harm under that model.  This Court should grant final approval of the Settlement, and allow the substantial relief it affords to reach class members at long last.

## I. Standard to be applied to Rule 23(e) fairness inquiry.

This Court is obligated to review settlements for fairness under FRCP 23(e).  After class members have been provided adequate notice and opportunity to be heard on a settlement, the Court may grant final approval if the settlement is "fair, adequate and reasonable." *Parker v. Anderson*, 667 F.2d 1204, 1208-1209 (5th Cir. 1982).  The decision to approve or reject a class action settlement rests within the discretion of the trial court. *Id.*, 667 F.2d at 1209.  The reasonableness review does not require that the Court adjudicate the dispute, as the whole reason for a settlement is avoidance of further litigation. *Id.*  While the Court has discretion in deciding whether to approve a settlement,

the Court may not amend the settlement terms in any way, only approving or rejecting the agreement. *Evans v. Jeff D.*, 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). Courts should support a fairness conclusion by memorandum opinion or otherwise in the record. *Id.*

"The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed class action is that the court must 'ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression.' " *In re Shell Oil Refinery*, 155 F.R.D. 552, 559 (E.D.La.1993). "In addition, the court acts 'as a fiduciary who must serve as a guardian of the rights of absent class members.' " *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

In exercising its discretion, the Court must remain cognizant that compromise is the essence of settlement. *Id.* In *Cotton*, the Fifth Circuit held, "The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Id.* (citations omitted). Here, the Court should exercise its discretion to approve a settlement which affords substantial relief after years of hard-fought litigation.

## II.     Presumptions in favor of a finding of fairness.

In considering fairness, the Court is aided by several presumptions. The Fifth Circuit has held, "In class actions, there is an overriding public interest in favor of settlement." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). For this reason, class action settlements are presumed to be fair reasonable and adequate, and should be approved absent any showing to the contrary.

-11-

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007).  Here, no one has made any showing to the contrary.  No one has even objected.

The Court is entitled to rely on the judgment of experienced class counsel, who have litigated the case from its outset and are in the best position to weigh the pros and cons of a settlement. *Cotton*, 559 F.2d at 1330.  The Court should hesitate to substitute its judgment for that of experienced counsel absent "fraud, collusion or the like." *Cotton*, 559 F.2d at 1330.  Once a court has granted preliminary approval, there is a presumption of fairness, and the burden to overcome this presumption is "heavy." *DeHoyos*, 240 F.R.D. at 293.  Here, no one has rebutted the presumption of fairness, because no one has even objected.

## III.   Analysis under the *Reed* Factors.

The Fifth Circuit has set forth six factors for a court to consider when evaluating a class action settlement for fairness under FRCP 23(e): (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members. *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983).  These factors, known as the *Reed* factors, are to be considered in light of the presumption in favor of class action settlements.  *DeHoyos*, 240 F.R.D. at 287.

Applying the *Reed* factors, even without the presumptions in favor of fairness, the record demonstrates that the Settlement Agreement easily meets the requirements of Rule 23(e).  Indeed, no one, not a single class member, has even suggested otherwise, much less made any showing

sufficient to overcome the presumptions in favor of a settlement as to which this Court has granted preliminary approval.

     **1.**     **Lack of fraud and collusion behind the settlement.**

Courts have recognized that the absence of collusion is the most important factor in conducting the fairness analysis required by FRCP 23(e). *Cotton*, 559 F.2d at 1330, *citing Young v. Katz*, 447 F.2d 431 (5th Cir. 1971). In fact, a finding that settlement agreements were conducted at arm's length gives rise to a presumption that the settlement is fair, reasonable and adequate. 4 NEWBERG ON CLASS ACTIONS § 11:41 (4th ed.2002). There is a presumption that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary. *Id*. at § 11:51.

This Court already made a determination that there was no collusion between Class Counsel and Progressive when it granted preliminary approval. See March 4, 2021 Order (Doc. 337), at ¶1. This conclusion is amply supported by the affidavits of Class Counsel, who confirmed that the negotiations were hard-fought over the course of several years, with the parties having mutually considered and rejected multiple proposals for settlement. There is no evidence, indeed no suggestion by anyone, that the settlement negotiations were anything other than an arm's length, adversarial process. The amount of the settlement (more than the total projected class-wide damages), the fact that 100% of the settlement fund will be disbursed to class members without a claims process, and the fact that the agreement makes no provision for attorneys' fees demonstrate that the Settlement Agreement was the product of arm's length negotiations. *See In re Chinese Drywall Products Liability Litigation*, 424 F.Supp. 3d 456, 486 (E.D. La. 2020) (facts that class counsel vigorously litigated over course of a decade and that Settlement Agreement left question of attorneys' fees to the court warranted finding of no collusion).

-13-

## 2.      Complexity, expense, and likely duration of the litigation

This factor militates in favor of settlement in this decade-old litigation.  As this Court is aware, it took the parties a decade of very active litigation, at the district and appellate levels, to reach a settlement.  Class Counsel had significant concerns that Progressive would disrupt the trial date in this matter by filing a third 23(f) appeal of this Court's denial of its Motion to Decertify. Even assuming that the trial date held, there could be little doubt of an appeal of any Plaintiff verdict. After that appeal, the Court would still have to consider the individual questions not resolved by the common issues trial.  With over 42,000 claims at issue, the expense and likely duration of resolution of remaining individual issues would still be a gargantuan task, particularly if Progressive were to challenge the individual entitlements.  It would be no exaggeration to say that this litigation, which has already lasted one decade, could easily have continued for another.  The costs of such prolonged litigation could be as great or greater than the considerable costs and attorney time expended thus far.

## 3.      Stage of the proceedings and the amount of discovery completed

The purpose of the "stage of proceedings and amount of discovery" factor is to determine "whether the parties have obtained sufficient information to evaluate the merits of the competing positions." *In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D 112, at 148 (E.D. La. 2013). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed ...." *Id.*  Here, there can be no question that Class Counsel were fully informed of the relative strengths and weaknesses of the class members' claims.

-14-

This settlement has only come after a decade of litigation, in which the parties have litigated every aspect of the case short of actual trial, including: Rule 12 motions to dismiss; class certification and 23(f) appeal; consideration of class certification on remand after appeal; a second petition for 23(f) appeal; issuance of litigation class notice; two rounds of discovery (pre-certification and post-certification); production of every class member's WCTL valuation(s); two rounds of exchange of expert reports and expert depositions (class certification and trial); multiple motions to compel discovery responses; informal exchanges of information in settlement negotiation; extensive summary judgment practice; and finally consideration and denial of a motion to decertify.  Through this extensive litigation, the parties and the Court have become intimately familiar with the strengths and weaknesses of the class's claims.  Perhaps most significantly, Class Counsel have obtained discovery not only on the common questions to be presented at the common issues trial, but also on the individual claims, in the form of WCTL reports issued for each claimant, which information has been used to assess potential damages, and is available for the Court-appointed Special Master to allocate settlement funds among the class.  In *Chinese Drywall*, a case that, like this one was vigorously litigated over the course of a decade, the district court found that this factor weighed heavily in favor of final approval.  424 F.Supp.3d 427 at 487.

### 4.     Probability of plaintiffs' success on the merits

While Class Counsel remain optimistic regarding the class's chances for success on the merits, they are cognizant of the risks of a trial on the merits and subsequent appeal.  At the time that the Settlement was reached, the Court had under consideration Plaintiffs' Motion for Summary Judgment on Statutory Compliance.  While the Court had indicated at the hearing on Progressive's Motion for Summary Judgment  that Plaintiffs might expect to prevail on that motion, subsequent

to the Court's comments in this regard, Progressive presented arguments and evidence not previously considered by the Court. Although Class Counsel remain confident of their position on the merits, there was certainly no guarantee that Plaintiffs would prevail on the question of statutory compliance.

Even if Plaintiffs had prevailed on the Motion for Summary Judgment on Statutory Compliance, there would still have been considerable risks at trial of the remaining common issues. The jury would still have to consider questions of the correct measure of damages. Progressive maintained that Plaintiffs' proposed measure of damages, the difference between NADA and WCTL valuations, was not the correct measure. Even if the Court had found Progressive did not comply with the statute at issue (La. R.S. 22:1892B(5)), Plaintiffs still faced the possibility that the jury would find Plaintiffs had failed to prove damages from the breach. Notably, no court has yet to consider the merits of Plaintiffs' proposed damages model.[8]

Also unresolved, was the crucial question of bad faith. The question of bad faith was to be decided by jury trial. Progressive was prepared to offer evidence that any violation of La. R.S. 22:1892B(5) was merely technical, and that the decision to use WCTL, even if in violation of the statute, was not in bad faith. Progressive would present evidence that it believed its use of WCTL complied with the requirements of La. R.S. 22:1892B(5). Under Louisiana law, if the insurer had a good faith reason to pay the amount it did, the insurer is deemed to have acted in good faith, even if it is ultimately found to have been wrong in its conclusion. *See Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107 (La. 10/21/03), 857 So.2d 1012, 1021.

---

[8] While the Fifth Circuit found Plaintiffs' proposed damage model "sound" for purposes of class certification, it did not reach the merits of whether the damage model was legally or factually valid.

Progressive had proffered the expert testimony of Robert Wooley, former Louisiana Commissioner of Insurance, who noted that the Louisiana Department of Insurance had never cited an insurer for violation of La. R.S. 22:1892B(5) for using the WCTL system.  No court has yet considered the merits of whether an insurer's use of WCTL can support a claim of bad faith.  When the class's claims present a novel theory, the "probability of success on the merits" factor weighs in favor of fairness.  *In re Linkedin User Privacy Litigation*, 309 F.R.D. 573, 586 (N.D. Cal. 2015).

In negotiating the Settlement Agreement, Class Counsel were cognizant of the risks that a jury trial could result in a loss to the class, or common issues findings that would result in damages lower than Plaintiffs' experts' damages projections.  Class Counsel were also aware of the risks that the appellate courts could reverse any findings in favor of the class.

Finally, denial of Progressive's Motion to Decertify would also be subject to review on appeal, either by 23(f) interlocutory appeal, or after judgment on the merits.  If the Fifth Circuit were to reverse the denial of Progressive's Motion for Summary Judgment or Progressive's Motion to Decertify, then the entire ten year litigation effort would have been for naught.  The risk of decertification should be considered in assessing probability of success on the merits.  *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 216 (1981).  Class Counsel exercised their judgment to consolidate a strong position into a generous settlement to the class, rather than risk adverse decisions at trial or on appeal that could weaken or entirely undo the position Class Counsel had attained through a decade of hard-fought litigation.

Class Counsel had reason to be optimistic about ultimate success on the merits, and the considerable value of the settlement fund reflects that fact.  However, Class Counsel are aware that success on the merits was far from guaranteed, particularly with respect to bad faith penalties, and

-17-

as such considered a settlement that assured recovery greater than Plaintiffs' experts' projection of damages to be in the class's best interest. This Court should not second-guess Class Counsel's assessment of the risks of litigation and advantages of a generous settlement at this juncture. *Cotton*, 559 F.2d at 1330.

  **5.**  **Range of Possible Recovery.**

  The settlement fund of $40 million is five million dollars *higher* than the damage projection of Plaintiffs' expert, Dr. Michelle Lacey. Dr. Lacey calculated the class-wide damages under Plaintiffs' primary theory of damages: the difference between NADA base value and WCTL base value. Using a statistical projection based on a sample of 1,800 class member claims, Dr. Lacey projected the class-wide damages at a mid-range of $35 million. It should be noted that Progressive vehemently opposed both Plaintiffs' proposed WCTL to NADA damage model and Dr. Lacey's statistical projection. Using Progressive's own "rough" NADA values, the only individualized data (as opposed to statistical projection) available, Plaintiffs' proposed damage model would produce approximately $20 million in damages.[9] Progressive likewise challenged use of this damages figure. Hence, at trial, the jury would be faced with a choice of values for class-wide damages ranging from $20 million to $35 million, both of which Progressive would attack with expert testimony. Under Plaintiffs' best case scenario, the jury would award $35 million in actual damages. The jury could accept Plaintiffs' proposed measure of damages and still only award $20 million if it opted to use Progressive's "rough" NADA values. Worse, the jury could accept Progressive's argument and find Plaintiffs had failed to prove any class-wide damages at all.

---

[9] See Expert Report of Dr. Johnette Hassell (Ex. B, hereto).

Additionally, Plaintiffs have an untested claim for statutory penalties for bad faith under La. R.S. 22:1892A or La. R.S. 22:1973.[10]  Section 1892A provides for penalties in the event of bad faith of half of the amount of under-payments, plus attorneys' fees.  In order to award penalties under Section 1892A, the jury would have to find both a breach of the duty of bad faith, and actual under-payments.  Both issues would be at issue in the common issues trial, even if this Court had granted Plaintiffs' pending Motion for Summary Judgment on Statutory Compliance.  Progressive was prepared to mount a vigorous defense on both issues.

Alternatively, the jury could have awarded penalties under La. R.S. 22:1973.  Plaintiffs asserted that La. R.S. 22:1973 allows penalties without regard to underpayment.  Progressive asserted that such penalties could only be awarded if the jury found under-payments, and then only to those to whom an underpayment had been awarded.  Penalties under La. R.S. 22:1973 are discretionary, and may be up to $5,000 per violation.  The jury has discretion to award less, even nominal penalties of only one dollar.  With 42,000 class members, the maximum penalty award would be over two hundred million dollars.  However, as the jury is under no obligation to award the maximum, the potential recovery at trial could be as little as one dollar, assuming the jury found bad faith at all.

The Court is to assess the potential for success on the merits together with the range of possible recovery and determine if the settlement is reasonable.  *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 217 (1981).  Here, the maximum potential recovery is high, in

---

[10]  An insured may opt to collect penalties under La. R.S. 22:1892 or La. R.S. 22:1973, but not both.  *Calogero v. Safeway Ins. Co.*, 1999-1625 (La. 1/19/00), 753 So. 2d 170, 174. However, an insured may opt to recover penalties under La. R.S. 22:1973 and still receive attorneys' fees under La. R.S. 22:1892.  *Id.*

excess of two hundred million dollars.  However, the odds of winning that amount and maintaining

it through appeal is low.  Significantly, Plaintiffs' recovery could only exceed $35 million if the jury

were to find bad faith.

The potential range of recovery at trial, even if Progressive's use of WCTL were found to be

in bad faith, ranges from $0 to $200 million.  Without penalties, the range of damages is from $0 to

$35 million.  The settlement fund, in excess of the projected actual class-wide damages, is fair,

adequate and reasonable.  The settlement makes the entire class whole and then some.  The fact that

the settlement amount exceeds Plaintiffs' maximum damages projection by $5 million adequately

accounts for the possibility that Plaintiffs could prevail on their bad faith penalty claim.

In weighing the potential for success on the merits against the range of recovery, the Court

is not bound simply to a mathematical computation of the range of recovery times a multiplier for

the potential for success on the merits, but rather should consider these factors together with the

other *Reed* factors, such as the reaction of the class to the settlement, the length and complexity of

the litigation, and the stage of the proceedings.  *Corrugated Container*, 643 F.2d at 217.  Taking all

of these factors into consideration, a settlement that makes the class whole and then some, after ten

years of litigation, is far superior to a potentially greater recovery after another decade of litigation.

Most significantly, the entire $40 million settlement fund will be disbursed to class members

without them having to do anything to prove their entitlements, which may not be the case if the

litigation were to continue. The Special Master allocation process contemplated by the settlement

assures that every class member's claim will be evaluated according to its individual merits.

Allocations to class members will be made in accordance with their actual damages.  Additionally,

because the settlement fund exceeds projected class-wide damages by $5 million, the Special

-20-

Master's proposed allocation will ensure that everyone, regardless of how they fare under the WCTL to NADA comparison, will receive a significant allocation, thus ensuring that those who have been exposed to the unlawful practice will receive a recovery. Without a settlement, these class members would be at risk of receiving nothing.

This is not a case where the potential settlement amount is high, but will only be reached if every class member submits a claim. Here, no class member will be required to submit any documentation unless they object to the Special Master's allocation. Because the data upon which every claim will be evaluated has already been obtained through discovery, and because the Special Master will make allocations to every class member based on that data, without the need of any input from class members, every class member *will* receive an allocation. The settlement fund does not represent potential recovery, but *actual* recovery. One hundred percent of the fund (less any court-awarded attorneys' fees, costs and incentive awards) will be disbursed to the class members.

**6.      Opinions of the class counsel, class representatives, and absent class members.**

The final items for the Court to consider are the opinions of class counsel, class representatives, and absent class members. Here, class counsel and the class representatives are strongly in favor of the settlement. In the opinion of Class Counsel, the settlement is an excellent result, making the entire class whole and then some. The settlement assures recovery to every class member, without individual class members having to take any steps apart from depositing their checks. Without this settlement, this litigation could continue for another decade, with the class members at risk of receiving less than their total damages, or worse, nothing at all.

-21-

Class Counsel unanimously support the Settlement.[11]  Class Counsel are all of the opinion that this settlement comes at the ideal juncture.  Class counsel have adequate information to ensure that all class members are adequately compensated according to their individual losses.  Class Counsel have stuck to their guns on settlement, undergoing extensive discovery and motion practice in order to generate a sufficient fund to pay one hundred percent of damages under Plaintiffs' damages model, plus provide a significant recovery to those who would not recover under that damages model, but who have been subjected to the practice complained of – all without class members having to do anything other than cash their checks.  Plaintiffs' position in this litigation is as strong as it can get short of trial.  Capitalizing on that strength by settling now is prudent.

The class representatives, who have seen this litigation through from its inception are equally pleased with the result.[12]  The class representatives believe that a payment in excess of projected damages now rather than years into the future, is in the best interests of the class.  Class representative Cheryl Slade has obtained for the entire class more than that which she had attempted to obtain for herself before bringing this lawsuit: the difference between Progressive's payment to her and the condition-adjusted NADA value.  Class representative Carnelius Borel-Minix, who is one of those individuals who complained of the practice, but did not suffer damages under Plaintiffs' proposed damages model, is pleased that even individuals in her situation will receive a recovery.

---

[11]  See affidavits of Class Counsel, attached hereto as Exhibit D

[12]  See affidavits of Class Representatives, attached hereto as Exhibit E

Both are pleased to see that, after ten years of litigation, every class member will receive a significant payment without having to jump through the hoops that they had to in bringing this action.[13]

Perhaps of even greater weight than the opinions of Class Counsel and class representatives are the opinions of absent class members, not one of whom has objected to the Settlement. Indeed, only two class members have elected to opt out, and one of them because she was already satisfied with her total loss payment.[14] Some 572 individuals went to the settlement website, registering over 1,300 page visits. None of these individuals, presumably the most interested and best informed of absent class members, has raised an objection. We know that because *no class member* has raised an objection.

Additionally, Class Counsel, Stephen B. Murray, Jr. and Kenneth St. Pe were identified on the class notice as people to call if any class member had questions about the settlement. Both fielded call from multiple class members. While the members had questions about how allocations would be determined and when they might expect payment, not one expressed dissatisfaction with the Settlement itself. In fact, most were complimentary of the Settlement and only wanted to know what they had to do to participate. Of course, one of the great advantages about this settlement is that class members need do nothing to participate, apart from cash or deposit the checks that are mailed to them.

---

[13] Class representative D. Wayne Stevens is deceased. However, his widow has monitored the litigation since he passed away. Mrs. Stevens, on behalf of her late husband, has likewise endorsed the Settlement Agreement.

[14] See Opt-Out request of Helen Branch, attached hereto as Exhibit G

## CONCLUSION

The proposed Settlement Agreement affords substantial relief to class members without them having to participate in any type of claims process.  If this Court approves the settlement, then class members will at long last be made whole for the harm caused by Progressive's use of WCTL.  Thousands of class members will receive settlement funds in the thousands of dollars.  All will receive a substantial distribution, more than enough to justify the effort of depositing or cashing the check.  Without the settlement, the class will have to wait indefinitely for this relief, and will run the risk of receiving nothing at all.  Because of the substantial relief afforded by the Settlement Agreement, not a single class member has raised an objection.  The Settlement Agreement easily meets the test of "fairness, reasonableness, and adequacy" and should be approved.  Accordingly, Plaintiffs pray that this Court grant their Motion for Final Approval.


RESPECTFULLY SUBMITTED,

MURRAY LAW FIRM


/s/ *Stephen B. Murray, Jr.*
STEPHEN B. MURRAY, JR.
STEPHEN B. MURRAY, SR.
ARTHUR M. MURRAY
HANCOCK WHITNEY CENTER
Suite 4250 Poydras Center
701 Poydras Street
New Orleans, Louisiana 70139
T: (504) 525-8100
F: (504) 584-5242

KENNETH D. ST. PÉ, APLC

/s/ *Kenneth D. St. Pé'*
KENNETH D. ST. PÉ

-24-

La. Bar Roll No. 22638
311 W. University Avenue, Suite A
Lafayette, LA 70506
(337) 534-4043


LAW OFFICES OF KENNETH W. DEJEAN

/s/ *Kenneth D. DeJean*
Kenneth W. DeJean
Post Office Box 4325
Lafayette, LA 70502-4325
Telephone: (337) 235-5294
Facsimile: (337) 235-1095


WHALEY LAW FIRM

/s/ *John R. Whaley*
JOHN RANDALL WHALEY (#25930)
BENJAMIN H. DAMPF  (#32416)
6700 Jefferson Highway
Building 12, Suite A
Baton Rouge, LA 70806
Tel: 225-302-8810
Fax: 225-302-8814

*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that the preceding pleading has been served on all parties through their

counsel of record by sending them a copy via electronic mail, on this 18th day of June, 2021.


/s/ *Stephen B. Murray, Jr.*
STEPHEN B. MURRAY, Jr.


-25-